1   KHAI LEQUANG (SBN 202922)
    klequang@orrick.com
2   RICHARD W. KREBS (SBN 278701)
    rkrebs@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE
    LLP
4   2050 Main Street
    Suite 1100
5   Irvine, CA  92614-8255
    Telephone:  +1 949 567 6700
6   Facsimile:   +1 949 567 6710

7   Attorneys for Plaintiffs EFG BANK AG,
    CAYMAN BRANCH and WELLS FARGO
8   BANK, NATIONAL ASSOCIATION, as
    securities intermediary for EFG BANK AG,
9   CAYMAN BRANCH

10                  UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12

13  EFG BANK AG, CAYMAN BRANCH;        Case No.  2:19-cv-01696
    and WELLS FARGO BANK,
14  NATIONAL ASSOCIATION, as           **COMPLAINT FOR:**
    securities intermediary for EFG BANK
15  AG, CAYMAN BRANCH,                 **1. BREACH OF CONTRACT;**

16              Plaintiffs,            **2. BREACH OF THE IMPLIED
                                          COVENANT OF GOOD FAITH
17         v.                             AND FAIR DEALING
                                          (CONTRACTUAL);**
18  JOHN HANCOCK LIFE INSURANCE
    COMPANY (U.S.A.)                   **3. BREACH OF THE IMPLIED
19                                        COVENANT OF GOOD FAITH
                Defendant.                AND FAIR DEALING
20                                        (TORTIOUS); AND**

21                                     **4. DECLARATORY RELIEF**

22

23                                     <u>**JURY TRIAL DEMANDED**</u>

24

25

26

27

28

4154-6688-3610                                        COMPLAINT

Plaintiffs EFG Bank AG, Cayman Branch ("EFG") and Wells Fargo Bank, National Association, as securities intermediary for EFG (EFG and Wells Fargo together, "Plaintiffs"), by and through their attorneys, file this Complaint against Defendant John Hancock Life Insurance Company (U.S.A.) ("John Hancock" or "Defendant"), and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) and (3) because (a) the action involves plaintiffs who are citizens of South Dakota and Switzerland (as described fully below), and a defendant that is a citizen of Massachusetts and Michigan; and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      This Court has personal jurisdiction over John Hancock because John Hancock regularly conducts and transacts business in California, including having issued all of the life insurance policies at issue in California.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(1), (a)(2), and 1391(b) because John Hancock conducts business in the Central District of California, and a substantial part of the events giving rise to the claims occurred in this judicial district, including John Hancock's issuance of the policies that are at issue in this Complaint.

## NATURE OF THE ACTION

4.      Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on John Hancock's unlawful increasing of the Applied Monthly Rates (referred to herein as "cost of insurance" or "COI" rates) on a targeted group of its in-force life Performance UL Core insurance policies owned by Plaintiffs (collectively, the "COI Increases" on Plaintiffs' "Performance Policies").  While John Hancock has not disclosed the criteria used to define this targeted group (the "Discriminated Group"), it appears to be comprised of disproportionate numbers of investor-owned policies and policies

1   originally issued to older-aged insureds.  By raising the cost of insurance rates

2   without a proper basis and, on information and belief, only on the Discriminated

3   Group, John Hancock has breached the terms of the Performance Policies.

4        5.    The Performance Policies are universal life insurance policies.

5   Universal life insurance is a form of life insurance also known as "flexible

6   premium" adjustable life insurance.  Universal life insurance consists primarily of

7   two distinct components: (1) the life insurance component, for which the insurance

8   company charges a cost to cover the risk of the insured's death (the cost of

9   insurance); and (2) a savings component, where premiums paid in excess of the cost

10  of insurance (and certain other policy charges) accumulate and earn interest at a rate

11  that will not be lower than a guaranteed minimum crediting rate.

12       6.    Universal life insurance is designed to give policyholders flexibility,

13  particularly with respect to the payment of premiums.  This can be demonstrated by

14  comparing universal life insurance to whole life insurance.  With whole life

15  insurance, a policyholder pays fixed monthly premium payments for the life of a

16  policy.  These fixed monthly premium payments include an amount associated with

17  the cost for the insurance company to bear the risk of the insured's death (i.e., the

18  cost of insurance) but also an additional amount intended to build up a "cash value"

19  that earns interest over time.  In the insured's earlier years, the fixed monthly

20  premium payments are typically far higher than the insured's actual risk of death,

21  and most of the premiums are used to accumulate cash value that will be used to

22  fund the death benefit in the later years of the insured's life, when the fixed

23  monthly premiums are likely to be lower than the actual risk of death.  That is, the

24  "cash value" build-up in the earlier years operates as a "reserve" to pay the death

25  benefit in the later years.

26       7.    Universal life insurance "unbundles" these two components of a whole

27  life insurance policy and allows policyholders to choose whether to pay just enough

28  premiums to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay

more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, can be used to pay for the cost of insurance in the future).

8.     Although there is no fixed monthly premium payment that is due, if the balance in the policy account is insufficient to cover the policy's monthly charges, which includes the cost of insurance and certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

9.     Universal life insurance policies have both guaranteed and non-guaranteed elements.  Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued.  Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy.  An example of a guaranteed element is the guaranteed minimum crediting rate.  An example of a non-guaranteed element is the cost of insurance rate, which is what John Hancock charges to bear the risk of the insured's death.  (While Plaintiffs' Performance Policies at issue here refer to this as the "Applied Monthly Rate," many universal life insurance policies refer to this as the "cost of insurance" rate because it is the rate that the insurance company charges purely for insurance coverage.)

10.     Although the Performance Policies permit John Hancock to adjust the cost of insurance rates (by increasing or decreasing them), the Performance Policies restrict John Hancock's ability to do so in at least two important ways.  First, John Hancock may only change cost of insurance rates based on its reasonable expectations as to "future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements."  So, for example, COI rate increases made to increase John Hancock's profitability, or to recoup past losses, are impermissible.  Second, any change in cost of insurance rates must be "on a uniform basis for insureds of the same sex, Issue Age, and premium class."  COI rate increases that target some Performance Policies but not

1    others or apply to some members of a class but not others without a reasonable

2    actuarial basis are discriminatory and unlawful.

3         11.    To better understand the basis for John Hancock's sudden and massive

4    rate increase, counsel, on behalf of certain Plaintiffs, attempted to obtain the

5    information that John Hancock relied on to justify its rate increase, including John

6    Hancock's original pricing assumptions (including mortality assumptions) and

7    evidence of its alleged adverse experience (including mortality experience), but

8    John Hancock ignored these requests.  Plaintiffs' counsel also made public records

9    requests for this information to the New York State Department of Financial

10   Services ("NYDFS"), but John Hancock objected to NYDFS providing such

11   records, claiming the information is confidential and trade secret.

12        12.    Notwithstanding John Hancock's efforts to conceal information about

13   the COI Increases, Plaintiffs have good reason to believe the rate increases breach

14   Plaintiffs' Performance Policies in multiple ways.  To begin with, the most

15   important assumption in life insurance is mortality.  Yet it is well-known in the life

16   insurance industry that since John Hancock began issuing the Performance Policies

17   in 2003, *mortality has improved*, not worsened.  This improvement in mortality has

18   resulted in new life insurance mortality tables that would, if anything, support a

19   *decrease*, not increase, in cost of insurance rates.  Despite this, John Hancock

20   *increased* its COI rates on Performance Policies, in blatant breach of the Policies'

21   express and implied terms and conditions.

22        13.    Industry analysts also have confirmed that mortality has continued to

23   improve.  For example, in 2016, Towers Watson, which insurers like John Hancock

24   frequently cite to, published a report with recommendations for mortality

25   improvement assumptions for life insurance companies.  All assumptions over age

26   55 are positive improvements, meaning that Towers Watson expects that mortality

27   will continue to improve at every age.  Similarly, statistics published by The

28   Human Mortality Database (HMD, organized by the Department of Demography of

the University of California, Berkeley) show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States.  And a Society of Actuaries (SOA) report on historical population mortality rates shows continuing mortality improvements every five years between 2000-2014.

14.     John Hancock says that it partly relies on this type of industry data in setting its mortality expectations, stating that "[m]ortality assumptions are based on our internal as well as industry past and emerging experience," and that it makes "assumptions about future mortality improvements using historical experience derived from population data."[1]  Any suggestion by John Hancock that its mortality expectations have developed in a way that is the opposite of the industry is implausible.  Given this consistent trend of improving mortality expectations, John Hancock should have *decreased* COI rates on the Performance Policies.  Instead, it raised COI rates dramatically, allegedly based on worse mortality expectations than those at issuance.  Even if John Hancock had some decline in its mortality expectations, contrary to the industry, that decline could not be close to warranting the massive COI Increases seen here.

15.     John Hancock admitted as recently as February 2016 that its "anticipated experience factors underlying any nonguaranteed elements [including cost of insurance] are not different from current experience."  This means that John Hancock's expectations of future mortality experience had not differed from its original expectations, and that no COI rate increases were on the horizon.  There have not been adverse experience and expectations within recent years, or since February 2016, that could justify an increase in COI rates, and certainly not one of this size.  Mortality—by far the biggest driver of COI rates—has been improving

---

[1] MANULIFE FINANCIAL CORPORATION, 2017 ANNUAL REPORT 68 (2017), http://manulife.force.com/servlet/servlet.FileDownload?file=00P50000010BL5xEAG&ver=10.

industry-wide at a rate of approximately 1% per year.  Even in the unlikely event that John Hancock has not shared in this mortality improvement, its mortality expectations could not have deviated so significantly in just two years to justify the COI Increases seen here.

16.    Furthermore, the COI Increases were not uniform among policyholders as required by the terms of the policies.  The policies either expressly promise that any increase in cost of insurance rates will be "on a uniform basis for insureds of the same sex, Issue Age, and premium class."  The COI Increases breach this provision because John Hancock applied increases to some Performance UL policies and not others, in materially different amounts, without any contractual or acceptable actuarial reason for that discrimination.  Indeed, while John Hancock told its agents in May 2018 that it decided to increase COI rates on "approximately 1,500" Performance UL policies out of a larger subset of 4,000 Performance UL policies issued between 2003 and 2010, John Hancock did not disclose why it chose that subset of 4,000 policies to review, nor why it increased rates on only 1,500 of those 4,000 policies.

17.    Tellingly, John Hancock did not increase COI rates on any of its other universal life products issued between 2003 and 2010, even though it told regulators that its mortality experience is "allocated across product lines."  By drastically raising COI rates by as much as 75% or more on only the Discriminated Group, it is apparent that John Hancock seeks to force Plaintiffs and other members of the Discriminated Group either to (a) pay exorbitant premiums that John Hancock knows will no longer justify the ultimate death benefits, or (b) lapse or surrender their Performance Policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their policies.  John Hancock, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums they have paid to date on them.

18.     It is apparent from John Hancock's own statements that John Hancock implemented the COI Increases to boost profits.  On a November 2017 earnings call for Manulife Financial Corporation (John Hancock's parent company, which reports on behalf of John Hancock in consolidated financial statements), Manulife's CEO acknowledged that the company's North American legacy business (which, on information and belief, includes Plaintiffs' Performance Policies) is "generating returns that are less than acceptable."  On this November 2017 earnings call, Manulife's CEO further stated that Manulife's "number one" priority is to "aggressively manage" its legacy blocks to "increase profitability and cash generation," and that "shareholder returns" will be a big part of how Manulife measures "progress in our legacy business."  Increasing its profit margins on its life insurance business, including the Performance Policies owned by the Discriminated Group, was at the forefront of John Hancock's agenda when it announced the COI Increases.

19.     In apparent response to complaints about similar COI rate increases made by other universal life insurance companies over the last several years, NYDFS recently enacted a new regulation that protects policyholders from unjustified life insurance premium increases.  Among other things, NYDFS Insurance Regulation 210 ("Reg 210") mandates the examination, as needed, of "anticipated experience factors at specified times and under specified conditions but no less frequently than required by law to determine if the factors are reasonable."  Reg 210 § 48.2(a)(1), 48.2(f)(2).  The regulation defines experience factors as "investment income, mortality, morbidity, persistency, or expense that represents the insurer's financial experience on a policy" and emphasizes "[p]rofit margin is not an experience factor."  Reg 210 § 48.1(h).

20.     In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS Superintendent Maria Vullo declared that New York

"will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases on New Yorkers simply to boost profits."[2]

21.    An article in *The Wall Street Journal* published the same day notes that the New York regulation "could be widely copied by other [states'] insurance departments."[3]

## THE PARTIES

22.    Plaintiff Wells Fargo Bank, National Association is a national banking association with its principal place of business in Sioux Falls, South Dakota.

23.    Plaintiff EFG Bank AG, Cayman Branch is a Swiss banking corporation with its principal place of business in Switzerland; Cayman Branch refers to a branch office in the Cayman Islands.  EFG is the ultimate owner and beneficiary of the life insurance policies at issue in this case, which EFG holds in a security account maintained by Wells Fargo, as securities intermediary for EFG pursuant to a Securities Account Control Agreement, dated as of November 7, 2007, between EFG Bank AG, Guernsey Branch and Wells Fargo, as modified by that certain Assignment and Amendment Agreement dated as of June, 2010, by and among EFG, EFG Bank AG, Guernsey Branch, and Wells Fargo (as modified, the "SACA Agreement").[4]  Under the SACA Agreement, each life insurance policy at issue constitutes a "Financial Asset" that Wells Fargo, as securities intermediary, has credited to the securities account.  EFG is the "entitlement holder" and is entitled to exercise the rights that comprise each Financial Asset credited to the

[2] See Press Release, NYDFS, DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases (Nov. 17, 2016), http://www.dfs.ny.gov/about/press/pr1611171.htm.

[3] Leslie Scism, New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rateson-old-policies-1479394201.

[4] Here, as securities intermediary, Wells Fargo is "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14)(ii).

1    securities account.  EFG owns the ultimate financial interests in the policies.  Wells

2    Fargo, as securities intermediary for EFG, is identified as the owner and beneficiary

3    on the records of the insurance company.

4         24.    Upon information and belief, Defendant John Hancock Life Insurance

5    Company (U.S.A.) ("Defendant" or "John Hancock") is a stock life insurance

6    company incorporated in Michigan and headquartered in Boston, Massachusetts.  In

7    addition, in 2009, John Hancock acquired John Hancock Variable Life Insurance

8    Company, the issuer of Plaintiffs' Performance Policies.  The ultimate parent of the

9    John Hancock is Manulife Financial Corporation ("Manulife"), a Canadian-based

10   insurance and financial services holding company.  John Hancock, through its

11   predecessor (John Hancock Variable Life Insurance Company), issued and holds

12   Plaintiffs' Performance Policies hit by the COI Increases.  John Hancock is

13   authorized to do business in the State of California and regularly conducts its

14   business in the State of California, including within this judicial district, and issued

15   all of Plaintiffs' Performance Policies in this judicial district.

## FACTUAL BACKGROUND

### A.    Plaintiffs Are Owners of John Hancock's Universal Life Insurance Policies Subject to John Hancock's Rate Increases

19        25.    EFG is the ultimate owner and beneficiary of 6 John Hancock policies

20   that are subject to John Hancock's increase in cost of insurance rates.  These

21   policies were issued between December 2004 and January 2006 and range in face

22   amount from $5 million to $10 million, and are listed on the attached **Exhibit 1**.

23   Plaintiffs' Performance Policies were issued in the State of California.  A sample

24   Plaintiffs' Performance Policy, redacted for privacy, is attached hereto as **Exhibit**

25   **2**.  As noted above, Wells Fargo Bank, National Association is listed on John

26   Hancock's records as the owner and beneficiary of Plaintiffs' Performance Policies,

27   but solely as securities intermediary for EFG.  EFG, as the entitlement holder, owns

28   the ultimate financial interest in Plaintiffs' Performance Policies.

26.     As is typical of universal life insurance policies, Plaintiffs' Performance Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly deductions described in Plaintiffs' Performance Policies.  The monthly deductions generally consist of a premium charge, an administrative charge, a face amount charge, and a cost of insurance charge, plus charges for any policy riders.

27.     The cost of insurance charge is by far the largest and most significant charge.  This charge, also known as the mortality charge, reflects the price that John Hancock charges to cover the risk of death.  The cost of insurance charge is determined by multiplying the Applied Monthly Rate times the net amount at risk. The net amount at risk is essentially (with minor variation between some of the policies) the death benefit, also known as the face amount, minus the policy value. The policy value is deducted from the death benefit because, although the policy account value is part of the death benefit paid upon the insured's death, policyholders do not pay cost of insurance on the policy account value, which is the savings component of Plaintiffs' Performance Policies and not the "insurance."

28.     The cost of insurance rates under a policy are based initially on certain characteristics of the insured, including her or his gender, age, and underwriting class (*i.e.*, preferred plus, preferred, standard, and substandard classes).  The cost of insurance rates increase every year as the insured ages.

29.     Each of Plaintiffs' Performance Policies has the same language regarding how the COI rates will be determined.  The policies provide:

> The Applied Monthly Rates are the actual rates used to calculate the Cost of Insurance Charge.  We will determine the Applied Monthly Rates to be used for this policy.  The Applied Monthly Rates will be based on our expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements and will never be greater than the Maximum Monthly Rates shown in Section 2 divided by 1,000.  They will be reviewed at least once every 5 Policy Years.  Any change in Applied Monthly Rates will be made

on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force the same length of time.

Ex. 2 at 11.

30.     Accordingly, among many other things, under the terms of Plaintiffs' Performance Policies, cost of insurance rates: (a) can only be based on John Hancock's reasonable assumptions as to "future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements"; (b) must be made "on a uniform basis for insureds of the same sex, Issue Age, and premium class"; and (c) cannot recoup past losses or be used to increase John Hancock's profitability.

**B.     John Hancock Raises Cost of Insurance Rates Solely on the Discriminated Group's Policies**

31.     In May 2018, John Hancock began notifying the Discriminated Group that it was raising the cost of insurance rates on certain of its Performance Policies. A sample letter for one of Plaintiffs' Performance Policies is attached hereto as **Exhibit 3**. The letter cryptically states that John Hancock's "expectation of future experience has changed, and therefore the Cost of Insurance rates on [the policyholder's] Performance UL policy will be increasing . . . ." Ex. 3, at 1. The letters contained no other reasons or justifications for the COI increase—they did not say how much the rate increase would be or explain how its expectation of future experience had changed, nor did they say what policies or policyholders were subject to a rate increase. John Hancock has not offered any explanation for these disparate increases.

32.     In addition to the notice letters, a document that John Hancock released to brokers and agents disclosed that the COI Increases—which John Hancock decided to apply to "a subset" of its Performance UL policies with increase amounts that vary (significantly) by policy—are "a result of changes in

[John Hancock's] expectations of future mortality and lapse experience." Ex. 4 at 1.  John Hancock further explained that, of 4,000 Performance UL policies that it reviewed for rate increase, it was raising rates on only 1,500.  *Id.*  Again, John Hancock did not explain how changes in its mortality and lapse experience warranted a cost of insurance rate increase, why only 4,000 policies were selected for review out of the universe of Performance UL policies, why only 1,500 were ultimately selected to receive a rate increase, or how it determined the significantly disparate COI rate increase amounts applied to each affected policy.

33.     In June of 2018, counsel, on behalf of Plaintiffs, sent public records requests for information about John Hancock's rate increase to state insurance regulators, including NYDFS.  NYDFS responded that it had documents responsive to Plaintiffs' counsel's requests, but that John Hancock had objected to NYDFS producing those documents on the basis they were confidential and trade secret. After further correspondence, NYDFS produced a handful of heavily redacted documents that revealed very little about the rate increases.

34.     Thus, before commencing this action, Plaintiffs were unable to obtain, either from John Hancock or from insurance regulators, any information evidencing the bases for John Hancock's COI rate increases.  Because only John Hancock and its regulators have this information, John Hancock's refusal to provide the information has prevented policyholders like Plaintiffs from verifying the accuracy of John Hancock's representations that the COI Increases are justified.

35.     Regardless, it is apparent that John Hancock's COI Increases breach Plaintiffs' Performance Policies in at least two ways.  ***First,*** the COI Increases unfairly discriminate against Plaintiffs in multiple respects.  ***Second,*** the COI Increases are not based on "expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements."  Rather, Plaintiffs are informed and believe, and on that basis allege, that in raising COI rates, John Hancock considered factors it could not consider

1   under the Performance Policies, including increasing its profits and recouping past
2   losses.

3          **C.      The COI Increases Unfairly Discriminate Against Plaintiffs**

4          36.     Plaintiffs' Performance Policies state that any changes in cost of
5   insurance rates will "be made on a uniform basis for insureds of the same sex, Issue
6   Age, and premium class."  Aside from the unrelated discussion of beneficiary
7   classes, the only "class" referred to in Plaintiffs' Performance Policies is the
8   "premium class."  *See, e.g.*, Ex. 2 at 11.  But instead of implementing rate increases
9   that are equitable to policyholders in a given class, John Hancock applied the COI
10  Increases to an undefined subset of Performance Policies, thus identifying a new
11  class of policyholders to be the target of its rate increases.  John Hancock also
12  discriminated within this new class by applying materially different COI rate
13  increase amounts to the affected policies.

14         37.     John Hancock has admitted to its brokers that it applied COI increases
15  to 1,500 out of 4,000 Performance UL policies that it reviewed, and, on information
16  and belief, there are thousands more Performance UL policies that John Hancock
17  apparently did not even review for the purpose of implementing a COI increase.
18  John Hancock has not revealed the criteria it used to target some policies with an
19  increase and not others, but preliminary investigation reveals that there does not
20  appear to be any actuarial justification for the choices.  Similarly, John Hancock is
21  applying significantly different increase amounts amongst the policies it is
22  targeting, and there is no actuarial justification for this disparate treatment either.

23         38.     Further, John Hancock has not announced an increase in COI rates for
24  any of its other universal life products, even though John Hancock issued other
25  types of universal life policies between 2003 and 2010 (such as Majestic UL,
26  SVULZ and Majestic VULX).  These other products, by John Hancock's own
27  admission, shared the same initial mortality assumptions as the Performance
28  Policies affected by the COI Increases.  If John Hancock really had determined COI

4154-6688-3610

COMPLAINT

1   increases "based on expectations" as to mortality and lapses, as it claims, then its

2   COI rates would have increased for a broad range of life insurance policies, and not

3   just the (subset of) Performance Policies.  That John Hancock did not implement

4   any such broad increase confirms that the COI Increases are being unlawfully used

5   to target certain policies and policyholders in an inequitable manner and based on

6   improper factors not provided for in the policy.

7        **D.    The COI Increases Are Not Based on Reasonable Expectations as**

8             **to Future Cost Factors**

9        39.    Plaintiffs' Performance Policies state that the COI rates "will be based

10  on [John Hancock's] expectations of future investment earnings, persistency,

11  mortality, expense and reinsurance costs and future tax, reserve and capital

12  requirements."

13       40.    John Hancock has pointed to only two factors to justify the increase:

14  "changes in [John Hancock's] expectations of future mortality and lapse

15  experience."  Not only does John Hancock ignore positive changes in some

16  enumerated factors (like "tax assumptions"), but also changes in these two factors

17  could not possibly warrant COI rate increases, much less the substantial increases

18  seen here.

19            **1.    The COI Increases Are Not Based on John Hancock's**

20                 **Reasonable Expectations of Future Mortality**

21       41.    While mortality is the most significant factor in providing life

22  insurance coverage, it is well known in the life insurance industry that over the past

23  three decades, mortality has *improved*, not worsened, and people are living much

24  longer than anticipated several years ago when John Hancock priced Plaintiffs'

25  Performance Policies.  For example, in 2015, the National Center for Health

26  Statistics reported "[s]ignificant decreases in mortality in 2014 compared with

27  2013" and observed that this year-to-year improvement was "consistent with long-

28  term trends."  "Although year-to-year changes are usually relatively small,"

1    explained the National Center for Health Statistics, "the age-adjusted death rate in

2    the United States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."  This

3    "long-term trend" of improving mortality is also evidenced by the release of several

4    new mortality tables over the past two decades that would, if anything, support a

5    decrease, not an increase, in the COI rates.

6          42.    In 2001, the SOA and the American Academy of Actuaries ("AAA")

7    produced the 2001 Commissioner's Standard Ordinary ("CSO") Table, which

8    replaced the previous 1980 CSO Table to reflect significant improving mortality.

9    The SOA also is currently investigating an update of the 2001 CSO Table, and a

10   2015 investigative report by the SOA showed significant reductions in insurance

11   company reserves compared to the 2001 CSO Table due to mortality improvements

12   since 2001.  In 2008, the SOA also released a 2008 Valuation Basic Table ("VBT")

13   that reflected significant mortality improvements compared to prior tables.  In 2014,

14   the SOA released the 2014 VBT, which showed overall mortality improvement

15   from the 2008 VBT.

16         43.    These new mortality tables demonstrate that since John Hancock

17   originally priced Plaintiffs' Performance Policies, mortality has improved, not

18   worsened, and this change in mortality would support a decrease, not increase, in

19   COI rates.

20         44.    John Hancock's regulatory filings over the past several years also do

21   not reflect any adverse changes to mortality that would support the COI Increases.

22   Every year, John Hancock files responses to form interrogatories with the National

23   Association of Insurance Commissioners ("NAIC"), which are signed by an actuary

24   at John Hancock, concerning John Hancock's "non-guaranteed elements" (which

25   include COI rates).  One of the form interrogatories asks insurers whether "the

26   anticipated factors underlying any nonguaranteed elements" are different from

27   current experience, and if so, insurers must describe in general the ways in which

28   "future experience is anticipated to differ" and "the nonguaranteed element factors

that are affected by such anticipation."  For each year between 2006 and February 2016, John Hancock stated that, with exceptions not relevant here, "the anticipated experience factors underlying any nonguaranteed elements are not different from current experience" and that it "continue[s] to monitor experience."  This means that as of February 2016, John Hancock admitted that its expectations of future mortality experience had not differed from its original expectations, and that no COI increases were on the horizon.  There have not been adverse experience and expectations within recent years, or since February 2016, that could justify increases in COI rates, and certainly not ones of the magnitude seen here.  Mortality—by far the biggest driver of COI rates—has been improving industry-wide at a rate of approximately 1% per year.  Even if John Hancock has for some reason not shared in this mortality improvement, its mortality and lapse expectations could not have deviated so drastically in just two years to justify its massive COI Increases.

## 2. The COI Increases Are Not Based on John Hancock's Reasonable Expectations of Future Lapse Experience

45.     Plaintiffs' Performance Policies list "persistency" as one of the enumerated factors.  John Hancock claims that the COI Increases are at least partly driven by a change in its expectations of future "persistency."  But no change in persistency could warrant increases, much less ones of the size seen here, and John Hancock appears to misinterpret the "persistency" factor.

46.     John Hancock told regulators as recently as a sworn filing in February 2016 that "the anticipated experience factors underlying any nonguaranteed elements," such as its lapse expectations, "are not different from current experience."  There is no downturn in persistency or lapse experience in the last two years that could have warranted a change in lapse expectations for the worse, and certainly not so much as to cause the substantial increases imposed on the Discriminated Group's policies.  John Hancock's admission that lapse expectations

did not change between product issuance and February 2016 attests to the stability of lapse rates.  Industry studies also confirm that lapse rates do not vary much from year to year.  For example, a 2016 industry study by A.M. Best—an entity whose ratings Manulife quotes on its website—indicated that industry lapse rates between 2006-2015 only varied between approximately 5.3%-7%, which is far less variation than would be needed to justify even a few percentage points of a COI increase.

47.     Further, the Performance Policies were all issued between December 2004 and January 2006, so they have all been in force at least 12 years.  Any adverse lapse experience would have been detected in the early years of the policies, not in the later years.  A 2012 industry study published by the Society of Actuaries—reporting on a survey of the industry including John Hancock— indicated that between 2001-2009, the industry lapse rates for universal life policies that have been in force more than six years are stable, varying less than approximately two percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force.  This indicates that any volatility that John Hancock may have seen in these policies would have occurred in the early years, not now, and given that John Hancock admitted in February 2016 that its lapse expectations had not changed, it is implausible that any change in lapse rates since issuance could justify a material change in COI rates.  Moreover, on its November 2017 earnings call, Manulife explained that Manulife's review of lapses in 2017 only focused "on lapse in Canada and parts of Asia," and that Manulife anticipates that it will "be reviewing lapse in the U.S. next year."  Given that John Hancock did not even conduct a "deep dive" review of its lapse assumptions in 2017 for U.S. business, John Hancock could not possibly have had a recent change in lapse expectations that would justify these substantial increases to Plaintiffs' Performance Policies.

48.     John Hancock also appears to misinterpret the "persistency" factor to mean that John Hancock is permitted to raise COI rates when *fewer* people lapse

than John Hancock expected.  The 2016 A.M. Best study indicates that industry lapse rates were at 20-year lows between 2012-2015.  Similarly, John Hancock's 2016 financial statement indicated that lapse rates for its low cost universal life products were reduced, which led to a decrease in net income attributed to shareholders.  While an insurer may contend that in some circumstances it should be permitted to consider the loss of income resulting from *higher* lapses, it may not use lower lapses to justify a COI increase on the theory that John Hancock was counting on insureds to forget to pay their premiums.  The policies do not permit John Hancock to punish its customers for paying their bills on time.  Such a result would be unconscionable.  As John Hancock told policyholders in announcing the rate hike, if policyholders do not increase their premiums or reduce their death benefit, then their policies will lapse.  This is part of John Hancock's design: it is using the COI Increases to force the lapses it was counting on.

49.    In any event, even if John Hancock's lapse expectations are worse, lapses still would not justify John Hancock's substantial rate increases, particularly in the face of improving mortality and potentially other factors.

**3.    The COI Increases Ignore John Hancock's Favorable Future Expectations, Such As Tax Assumptions and Investment Earnings**

50.    While Plaintiffs' Performance Policies require that COI rates "will be based on [John Hancock's] expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements," John Hancock admitted to its agents that it ignored all but two of these factors and imposed the COI Increases "as a result of changes in our expectations of future mortality and lapse experience" alone.  But John Hancock is not permitted to ignore enumerated factors that it does not like.

51.    For example, John Hancock ignores its favorable "tax assumptions."  In the past six months, Manulife, which owns and reports on behalf of John

1  Hancock and its affiliates in the United States and international companies, has

2  been publicly touting the massive benefits of U.S. Tax reform to its US operations.

3  For example, in early 2018, Manulife stated that the expected "impact" of "U.S.

4  Tax Reform" enacted in the fourth quarter of 2017 is "an expected ongoing benefit

5  to net income attributed to shareholders and core earnings of approximately ***$240***

6  ***million per year*** commencing in 2018."  This is on top of a series of "refinements"

7  to John Hancock's actuarial models to "more accurately reflect the impact of tax

8  timing differences on policy liabilities."  John Hancock told investors that "[t]hese

9  refinements resulted in a benefit to net income of $696 million."

10       52.    John Hancock, however, simply ignored this huge expected future tax

11  benefit, even though the policies list expectations of future "tax assumptions" as

12  one of the factors that COI rates "will be based on."

13       53.    John Hancock also recently admitted that as a result of a review of its

14  future corporate "spread assumptions" (i.e., investment earnings), it claimed a $344

15  million benefit to net income attributed to shareholders.  And yet John Hancock

16  ignored this too, even though investment earnings are listed as an enumerated

17  factor.

18       54.    John Hancock cannot pick and choose to look only at the enumerated

19  factors that it claims warrant an increase and ignore those that point in the other

20  direction.  But that is exactly what John Hancock did.  If John Hancock had

21  considered its future expected tax benefits, investment earnings, and other

22  improvements among the enumerated factors, then a COI ***decrease*** would have

23  been warranted, not an increase.

24              **4.    John Hancock Improperly Raised COI Rates to Increase**

25                     **Profitability**

26       55.    The COI Increases were also driven by John Hancock's desire to

27  increase profits, which is not an enumerated factor.  On an earnings call in

28  November 2017, Manulife's CEO, Roy Gori, acknowledged that the company's

North American legacy business (which, on information and belief, includes the policies hit by this increase) was generating "less than acceptable" returns.  On the same earnings call, CEO Gori further stated that Manulife's first "priority" is to "aggressively manage" its legacy blocks to "increase profitability and cash generation."  The COI Increases, which were announced six months later, are clearly part of Manulife's effort to "increase profitability" on the legacy block of Performance Policies issued between 2003 and 2010.  But increasing profits is not an enumerated factor on which an increase can be based under the terms of Plaintiffs' Performance Policies.

### 5.    The COI Increases Recoup Past Losses

56.    Plaintiffs' Performance Policies require that COI rates "will be based on our expectation of future" experience factors.  This forbids COI rate increases that are based on John Hancock's desire to make up for past losses.  Basic actuarial principles that are incorporated into the policies also prohibit John Hancock from implementing COI rate increases that would result in John Hancock making more profit on the policies than it previously expected using its prior expectations.  In an October 2017 earnings call, John Hancock admitted that the steps it was about to take, which included the COI Increases, were part of its effort to "aggressively manage" its legacy blocks in an attempt to "increase profits," in response to "less than acceptable returns" in the past.  That is impermissible recouping of past losses.

57.    In its financial statements, Manulife (reporting for John Hancock) claims to do an annual "full year review" of its actuarial assumptions, including its mortality assumptions.  In the interrogatories it files with regulators, John Hancock has also told regulators that it applies its updated mortality assumptions "by risk classification across all product lines."  To the extent John Hancock claims that its mortality has not been as good as it originally expected for some of these policies, John Hancock would have known about any such issues for more than a decade (and at least since the products were priced).  John Hancock cannot use COI rate

increases now to make up for alleged losses that, if John Hancock's story is to be believed, it must have known about long ago.  To do so would be to recoup past losses, in violation of Plaintiffs' Performance Policies and fundamental actuarial principles.

## COUNT I

### (Breach of Contract - Express)

58.    Plaintiffs reallege the allegations contained in paragraphs 1 through 57, inclusive, as if set forth fully herein.

59.    Plaintiffs' Performance Policies are binding and enforceable contracts.

60.    Defendant materially breached Plaintiffs' Performance Policies in several respects, including but not limited to the following:

a.    By increasing the cost of insurance rates on a basis that unfairly discriminates within the class of policyholders;

b.    By increasing the cost of insurance rates on a basis other than "expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements"; and

c.    By imposing excessive cost of insurance rates.

61.    Plaintiffs have performed all of their obligations under Plaintiffs' Performance Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

62.    As a direct and proximate cause of Defendant's material breaches of Plaintiffs' Performance Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT II

**(Implied Covenant of Good Faith and Fair Dealing – Contractual Breach)**

63.    Plaintiffs reallege the allegations contained in paragraphs 1 through 62, inclusive, as if set forth fully herein.

64.    Plaintiffs' Performance Policies are binding and enforceable contracts.

65.    Plaintiffs' Performance Policies include an implied covenant, actionable in contract, that Defendant will act in good faith and deal fairly with Plaintiffs.

66.    Defendant materially breached Plaintiffs' Performance Policies in several respects, including but not limited to the following:

a.    By only raising cost of insurance rates on a targeted group of Performance Policies, thereby unfairly discriminating within the class of policyholders;

b.    By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of their actual policy account values;

c.    By increasing the cost of insurance rates in an attempt to achieve John Hancock's original expected profitability for the Policies at the policyholders' expense;

d.    By attempting to force Plaintiffs and other policyholders to either (a) pay exorbitant premiums that John Hancock knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their Policies, thereby forfeiting the premiums they have paid to date; and

e.    Failing to provide any meaningful disclosures about the cost of insurance rate increases.

67.    Plaintiffs have performed all of their obligations under Plaintiffs' Performance Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

68.     Defendant's breaches were conscious, deliberate, and unreasonable acts, which were designed to and which did unfairly frustrate the agreed common purposes of Plaintiffs' Performance Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of Plaintiffs' Performance Policies.

69.     As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT III

**(Implied Covenant of Good Faith and Fair Dealing – Tortious Breach)**

70.     Plaintiffs reallege the allegations contained in paragraphs 1 through 69, inclusive, as if set forth fully herein.

71.     Plaintiffs' Performance Policies are binding and enforceable contracts.

72.     Plaintiffs' Performance Policies include an implied covenant that Defendant will act in good faith and deal fairly with Plaintiffs.

73.     Defendant materially breached Plaintiffs' Performance Policies in several respects, including, but not limited to, the following:

a.     By only raising cost of insurance rates on a targeted group of Performance Policies, thereby unfairly discriminating within the class of policyholders;

b.     By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of their actual policy account values;

c.     By increasing the cost of insurance rates in an attempt to achieve John Hancock's original expected profitability for the Policies at the policyholders' expense;

d.     By attempting to force Plaintiffs and other policyholders to either (a) pay exorbitant premiums that John Hancock knows would no longer

1    justify the ultimate death benefits, or (b) lapse or surrender their Policies,

2    thereby forfeiting the premiums they have paid to date; and

3    e.    By failing to provide any meaningful disclosures about the cost of

4    insurance rate increases.

5    74.    Plaintiffs have performed all of their obligations under Plaintiffs'

6    Performance Policies, except to the extent that their obligations have been excused

7    by Defendant's conduct as alleged herein.

8    75.    Defendant's breaches were conscious, deliberate, and unreasonable

9    acts, which were designed to and which did unfairly frustrate the agreed common

10   purposes of Plaintiffs' Performance Policies and which disappointed Plaintiffs'

11   reasonable expectations by denying Plaintiffs the benefits of Plaintiffs'

12   Performance Policies.

13   76.    As a direct and proximate cause of Defendant's breaches of the

14   implied covenant of good faith and fair dealing, Plaintiffs have been damaged as

15   alleged herein in an amount to be proven at trial, but in any event that exceeds

16   $75,000, exclusive of interest.  Furthermore, Defendant's conduct was conscious

17   and deliberate, and constitutes oppression, fraud, or malice, justifying an award of

18   punitive damages.

19   ## COUNT IV

20   **(Declaratory Relief)**

21   77.    Plaintiffs reallege the allegations contained in paragraphs 1 through

22   76, inclusive, as if set forth fully herein.

23   78.    For reasons including, but not limited to, those stated herein, there

24   exists an actual dispute and controversy between Plaintiffs and Defendant

25   concerning Plaintiffs' rights and Defendant's obligations under Plaintiffs'

26   Performance Policies, including, but not limited to, how Defendant must implement

27   any change in the cost of insurance rates and under what circumstances Defendant

28   may change the cost of insurance rates.

79.     Accordingly, Plaintiffs seek a declaration (a) that Defendant's cost of insurance rate increase are improper under Plaintiffs' Performance Policies and that any excess premiums received must be returned or the Policies' account values recalculated according to the original cost of insurance rates; and (b) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates.

80.     Such a declaration will help prevent or limit any future controversies under Plaintiffs' Performance Policies by providing guidance as to when and how Defendant can change the cost of insurance rates on its in force Performance Policies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

### **On the First Count**

1.     For compensatory damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other and further relief as the Court may deem proper.

### **On the Second Count**

1.     For compensatory damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other and further relief as the Court may deem proper.

### **On the Third Count**

1.     For compensatory damages in an amount to be determined at trial;

2.     For punitive damages in an amount to be determined at trial;

3.     For an award of pre-judgment and post-judgment interest;

1    4.    For the costs of the suit herein incurred, including reasonable

2    attorneys' fees to the extent permitted by law; and

3    5.    For such other and further relief as the Court may deem proper.

4                          **On the Fourth Count**

5    1.    For a declaration (a) that Defendant's cost of insurance rate increase is

6    improper under Plaintiffs' Performance Policies and that any excess premiums

7    received must be returned or the policies' account values recalculated according to

8    the original cost of insurance rates; and (b) setting forth the specific guidelines that

9    govern the factual circumstances under which Defendant can raise the cost of

10   insurance rates;

11   2.    For the costs of the suit herein incurred, including reasonable

12   attorneys' fees to the extent permitted by law; and

13   3.    For such other and further relief as the Court may deem proper.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4154-6688-3610

COMPLAINT

1

Dated:        March 7, 2019          Respectfully submitted,

2

3          ORRICK, HERRINGTON &
           SUTCLIFFE LLP

4

5          By:_____/s/ Khai LeQuang_____

6                        KHAI LEQUANG
           Attorneys for Plaintiffs EFG BANK AG,
7             CAYMAN BRANCH and WELLS
              FARGO BANK, NATIONAL
8             ASSOCIATION, as securities
              intermediary for EFG BANK AG,
9                  CAYMAN BRANCH

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4154-6688-3610

- 28 -                                  COMPLAINT

1

### **DEMAND FOR JURY TRIAL**

2        Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal

3    Rules of Civil Procedure.

4    Dated:        March 7, 2019                    ORRICK, HERRINGTON &
5                                                   SUTCLIFFE LLP

6

7                                                   By:_____*/s/ Khai LeQuang*_____
8                                                        KHAI LEQUANG
                                                    Attorneys for Plaintiffs EFG BANK
9                                                   AG, CAYMAN BRANCH and
                                                    WELLS FARGO BANK,
10                                                  NATIONAL ASSOCIATION, as
                                                    securities intermediary for EFG
11                                                  BANK AG, CAYMAN BRANCH

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4154-6688-3610

COMPLAINT